UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| ANDREW SPEESE, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 7:15-cv-5 |
| Plaintiff, | § § | JURY TRIAL DEMAND |
| v. | § § | |
| DAWSON GEOPHYSICAL COMPANY, STEPHEN C. JUMPER, CRAIG W. COOPER, GARY M. HOOVER, PhD., MARK VANDER PLOEG, TED R. NORTH, TIM C. THOMPSON, TGC INDUSTRIES, INC., and RIPTIDE ACQUISITION CORP., | § § § § § § § | |
| Defendants. | § § § | |

## DERIVATIVE AND DIRECT CLASS ACTION COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

1.      Plaintiff Andrew Speese ("Plaintiff"), by his attorneys, brings the following derivative and direct class action on behalf of himself and all shareholders of Dawson Geophysical Company ("Dawson" or the "Company"), other than Defendants (defined below) and their affiliates, against Dawson, certain officers and members of Dawson's board of directors (the "Board" or the "Individual Defendants"), TGC Industries, Inc. ("TGC"), and Riptide Acquisition Corp. ("Merger Sub") for breaching their fiduciary duties in connection with the proposed strategic business combination between Dawson and TGC (and/or aiding and abetting thereof).  The allegations in this Complaint are based on information and belief, including investigation of counsel and review of publicly available information, except for Plaintiff's own acts, which are alleged on personal knowledge.

2.      Dawson is a Texas corporation headquartered in Midland, Texas.  The Company provides onshore seismic data acquisition and processing services in the United States and Canada.  It acquires and processes 2-D, 3-D, and multi-component seismic data for its clients ranging from oil and gas companies to independent oil and gas operators, as well as the providers of multi-client data libraries.  The Company's 2-D method collects seismic data to generate a single plane of subsurface seismic data; and 3-D method creates a volume of seismic data, which produces precise images of the earth's subsurface.  As of September 30, 2013, Dawson operated approximately 14 3-D seismic data acquisition crews in the lower 48 states; one seismic data acquisition crew during the Canadian winter season; and a seismic data processing center.  The Company was founded in 1952 and has additional offices in Houston, Denver, Oklahoma City, and Pittsburgh.

3.      On October 8, 2014, Dawson and TGC announced that they had entered into a definitive Agreement and Plan of Merger (the "Merger Agreement").  Pursuant to the terms thereof, prior to completion of the merger, each holder of shares of Dawson common stock will be entitled to receive 1.760 shares of TGC common stock for each share of Dawson common stock owned, after giving effect to the proposed 1-for-3 reverse stock split to be effectuated by TGC, as well as cash payable in lieu of fractional shares pursuant to the terms of the merger agreement.  Current Dawson shareholders are expected to own approximately 66% of the outstanding shares of TGC common stock and TGC shareholders will own approximately 34% of the outstanding shares of TGC common stock.

4.      Specifically, according to the Merger Agreement, upon the consummation of the merger, each share of Dawson common stock issued and outstanding before the merger, other than any shares owned by Dawson, TGC or any of their respective subsidiaries, will be

converted into the right to receive 1.760 shares of TGC common stock, which is the exchange ratio, after giving effect to the reverse stock split.  No fractional shares will be issued to Dawson shareholders, and in lieu of any such fractional shares cash will be paid instead.  The exchange ratio has been calculated based on the number of shares of TGC common stock that will be outstanding following a 1-for-3 reverse stock split that will occur immediately prior to completion of the merger.  The number of shares of TGC common stock to be issued in the merger for each Dawson common share is fixed (except in the event of any stock dividend, subdivision, recapitalization, split, reverse split (other than the 1-for-3 reverse stock split occurring immediately prior to the merger), combination or exchange of shares or similar event with respect to Dawson common stock or TGC common stock) and will not be adjusted for changes in the market price of either Dawson common stock or TGC common stock (the "Proposed Transaction").

5.      The closing price of Dawson common stock on NASDAQ on October 8, 2014, the last full trading day prior to the public announcement of the merger, was $17.57.  The closing price of Dawson common stock on NASDAQ on November 5, 2014, the last practicable full trading day prior to the date of the filing of the S-4 (defined below), was $16.64.  The closing price of Dawson common stock on NASDAQ on December 30, 2014, the last practicable full trading day prior to the date of the filing of the Definitive Proxy (defined below), was $12.18. The closing price of TGC common stock on NASDAQ on October 8, 2014, the last full trading day prior to the public announcement of the merger, was $3.34.  The closing price of TGC common stock on NASDAQ on November 5, 2014, the last practicable full trading day prior to the filing of the S-4, was $3.16.  The closing price of TGC common stock on NASDAQ on

December 30, 2014, the last practicable full trading day prior to the filing of the Definitive Proxy was $2.11.

6.     As described below, however, both the merger consideration that Dawson's shareholders stand to receive and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and all other public shareholders of the Company.

7.     Indeed, some analysts have valued the Company **as high as $30 per share,** **s**ignificantly higher than the consideration the Company's shareholders stand to receive under the terms of the Merger Agreement.

8.     In addition to failing to obtain fair consideration for the Company's shareholders, the Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that discourage other potential bidders from submitting a superior offer for the Company.  These preclusive devices include: (i) a non-solicitation provision that restricts the Board from soliciting other potentially superior offers; (ii) an "information rights" provision, which provides TGC with access to information about other potential proposals, gives TGC three days to negotiate a new deal with Dawson in the event a competing offer emerges, and provides TGC with matching rights; and (iii) a termination fee of $2 million.  These provisions conjunctively and improperly restrain the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives to the Proposed Transaction.

9.     Furthermore, in connection with the Proposed Transaction, on November 6, 2014, TGC filed a Registration Statement on Form S-4 (the "S-4") with the U.S. Securities and Exchange Commission ("SEC") and on December 31, 2014, a Prospectus pursuant to Rule

424(b)(3) (the "Definitive Proxy") that both fail to provide material information and contains materially misleading statements concerning the Proposed Transaction.  As explained below, while the Definitive Proxy provides some detail about the sales process the Board undertook, it fails to disclose a host of material information concerning the Proposed Transaction including, among other things: (i) the process leading up to the consummation of the Merger Agreement; and (ii) the data and key inputs underlying the financial analyses performed by Dawson's financial advisor, Raymond James & Associates, Inc. ("Raymond James") and TGC's advisor, Stephens, Inc. ("Stephens") in connection with the Merger; and (iii) certain financial projections prepared by Dawson's and TGC's management and relied upon by Raymond James and Stephens in rendering their respective opinions as to the fairness of the Proposed Transaction.

10.     Moreover, since the announcement of the Merger, TGC has seen considerable downward volatility with respect to its share price, with its shares plummeting more than **35%**. Specifically, on the announcement of the Proposed Transaction, the implied consideration to Dawson shareholders was approximately $17.63 a share, based on the then current TGC share price of $3.34.  In effect, this amounted to a no premium transaction given the $17.57 share price for Dawson as of October 8, 2014.  However, because there is no collar on the exchange ratio, the current implied consideration to Dawson shareholders has dropped significantly since the announcement of the deal.  ***On December 30, 2014, TGC traded at $2.11, thus dragging Dawson down with it and valuing Dawson stock in the deal at only $11.45, a drop of 35%.***

11.     Thus, while the Individual Defendants may have ***hoped*** that by completing an all-stock transaction they would maximize shareholder value, the fact is that the Board failed to insist on a basic protective device for its shareholders – a collar – a standard deal mechanism by which parameters are set that attempt to minimize the impact of stock price fluctuations on the

value of the consideration payable to shareholders.  As a result, Dawson shareholders have no certainty with respect to the value of the deal when it closes.  A collar or cash consideration (in whole or in part) would provide additional certainty to Dawson shareholders that is notably absent from this deal.

12.     Perhaps more troubling is the fact that the parties had previously sought to effectuate a strategic business combination in 2011; however, the fact that Dawson stock began to trade outside of a collar range negotiated as part of that proposed deal was one of the reasons the deal fell through.  Here, the parties failed to provide such protections and, as a result, the deal value to Dawson shareholders has plummeted.

13.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, due care, and candor.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Dawson maintains its primary place of business in this District.

## PARTIES

16.     Plaintiff is a citizen of California and has been at all relevant times, the owner of Dawson shares and has held such shares since prior to the wrongs complained of herein.

17.     Dawson is a Texas corporation with its corporate headquarters located at 508 West Wall, Suite 800, Midland, Texas, 79701.  The Company provides onshore seismic data acquisition and processing services in the United States and Canada.  It acquires and processes 2-D, 3-D, and multi-component seismic data for its clients ranging from oil and gas companies to independent oil and gas operators, as well as the providers of multi-client data libraries.  The Company's 2-D method collects seismic data to generate a single plane of subsurface seismic data; and 3-D method creates a volume of seismic data, which produces precise images of the earth's subsurface.  As of September 30, 2013, Dawson operated approximately 14 3-D seismic data acquisition crews in the lower 48 states; one seismic data acquisition crew during the Canadian winter season; and a seismic data processing center.  The Company was founded in 1952 and has additional offices in Houston, Denver, Oklahoma City, and Pittsburgh.  Dawson common shares trade on the NASDAQ stock exchange under the symbol "DWSN."

18.     Defendant Stephen C. Jumper ("Jumper") is President, CEO and Chairman of the Board.  He has been a director of the Company since 2006 and has served as Chairman of the Board since January 2013.

19.     Defendant Craig W. Cooper ("Cooper") has been a director of the Company since January 2010 and Lead Director since January 2013.

20.     Defendant Gary M. Hoover, PhD. ("Hoover") has been a director of the Company since 2002.

21.     Defendant Ted R. North ("North") has been a director of the Company since 2008.

22.     Defendant Mark Vander Ploeg ("Vander Ploeg") has been a director of the Company since March 2014.

23.     Defendant Tim C. Thompson ("Thompson") has served as a director since 1995.

24.     Defendant TGC is a Texas corporation with its corporate headquarters located in Plano, Texas.  TGC provides geophysical services to companies in the oil and gas industry in the United States and Canada.  The company conducts three-dimensional surveys; sells gravity data; and provides seismic data acquisition services primarily to onshore oil and natural gas exploration and development companies for use in the onshore drilling and production of oil and natural gas, as well as to potash mining industry.  As of December 31, 2013, it operated eight seismic crews, which included five crews in the United States and three crews in Canada.  TGC common shares are traded on the Nasdaq under the symbol "TGE."

25.     Merger Sub is a Texas corporation and a wholly-owned subsidiary of TGC, and was created for purposes of effectuating the Proposed Transaction.

26.     The Individual Defendants, Dawson, TGC and Merger Sub are collectively referred to as "Defendants."

**THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

27.     By reason of the Individual Defendants' positions with the Company as directors and/or officers, said individuals are in a fiduciary relationship with Plaintiff and the other public shareholders of Dawson and owe Plaintiffs and the other members of the Class the duties of good faith, fair dealing, loyalty, and candor.

28.     By virtue of their positions as directors and/or officers of Dawson, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Dawson to engage in the practices complained of herein.

29.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders, and with due care.  To diligently comply with these duties, the directors of a corporation may not take any action that:

a.      Adversely affects the value provided to the corporation's shareholders;

b.      Contractually prohibits them from complying with or carrying out their fiduciary duties;

c.      Discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

d.      Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

30.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of Dawson, including their duties of loyalty, good faith, independence, and candor.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Dawson common stock who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

32.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of August 6, 2014, there were over eight million shares of Dawson common stock outstanding.  The holders of these shares are believed to be geographically dispersed through the United States;

b.      There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

     i.        Whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, due care, and/or candor with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

     ii.        Whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

     iii.        Whether the Individual Defendants have breached any of their fiduciary duties to Plaintiff and to the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, and fair dealing;

     iv.        Whether Dawson, TGC, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty;

     v.        Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

     vi.        Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### DEMAND IS FUTILE OR EXCUSED

33.     Plaintiff brings this action derivatively as to Count V in the right and for the benefit of Dawson to redress injuries suffered and to be suffered by Dawson as a direct result of the breaches of fiduciary duty and other violations of law by the Individual Defendants.

34.     Plaintiff incorporates all of the allegations in this Complaint as if they were fully set forth herein.  Plaintiff owns and has owned Dawson common stock at all times relevant hereto.  Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

35.     Dawson Board members have directly participated in the wrongs complained of herein, which disables them from acting independently, objectively and in good faith to advance the interests of Dawson or respond impartially to a demand by shareholders.  The Board therefore is not and cannot be disinterested.

36.     Demand is also excused pursuant to Texas law.  Pursuant to Texas Business Organization Code § 21.553, demand is excused if the corporation is suffering irreparable injury or would suffer irreparable injury by waiting until the expiration of the 90-day period under the

statute.  Here, the Company has announced a February 9, 2015 shareholder meeting to vote on the Proposed Transaction.  As such, the vote will take place prior to the expiration of the 90-day period and, therefore, demand is excused because the Company would be irreparably harmed if the shareholder vote on the Proposed Transaction was permitted to proceed without first affording the relief requested herein.  Under applicable Texas corporate law, demand is excused where, as here, a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation.

37.     Notwithstanding the aforementioned, on January 7, 2015, Plaintiff sent a demand to the Board via both Federal Express and regular mail asking that the Board investigate and commence an action against certain directors and executive officers of the Company for breaching their fiduciary duties to the Company in connection with the Proposed Transaction (the "Demand").  A true and correct copy of this Demand is attached hereto as Exhibit A.

38.     Given the exigencies involved – the February 9, 2015 vote – Plaintiff is compelled to act to secure the Company's right to relief against the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

**A.**     **Dawson's Recent Financial Performance**

39.     On November 12, 2013, Dawson announced impressive operating results for its fiscal fourth quarter and 2013 year-end results.  Specifically, the Company reported that EBITDA increased by 15%, to a record $57.2 million and income from operations increased 22% over 2012 to $20.1 million.  The Company also reported significant capital investments including 12,000 single-channel Geospace GSX units, 1,000 three-channel GSX units, 2,500 channels of the Wireless Seismic RT System 2 recording system and 10 INOVA vibrator energy source units to increase recording capacity and improve efficiency.

40.     Commenting on the strong year-end results, Defendant Jumper stated:

Steady demand for services fueled our fiscal 2013 results.  As a result, both income from operations and EBITDA for the year increased significantly despite decreased revenue from the prior year.  We believe that the decrease in 2013 revenue is not a reflection of decreasing geophysical demand, but rather, a product of both lower third-party charges as a percentage of revenue and the reduction in utilization experienced during the fourth quarter of the fiscal year.  Our Company continues to realize improved results and returns on the investments made since fiscal 2011.  Our increased efficiencies and crew productivity have us well positioned to capture more upside as market conditions improve.

Implementation of new technologies has played a big role in our financial and operational success in 2013.  Improved subsurface resolution and increased data from investments in these technologies is enabling our clients to make even more informed drilling decisions.  Equally important, we are providing data that allows our clients to make decisions across all phases of the demand cycle, from exploration to evaluation to exploitation.  As we move into fiscal 2014, we will continue to invest in technologies that provide our clients with the most robust data and subservice resolutions while, at the same time, generate strong returns for Dawson Geophysical.

41.     The year-end results further indicated the Company's strong financial position, "[t]he Company's balance sheet remains strong with approximately $79,000,000 of working capital, $13,000,000 of debt, $76,000,000 of cash and cash equivalents and short-term investments, and $115,000,000 of retained earnings.  In addition, the Company has $20,000,000 available under its undrawn revolving line of credit.  The Company anticipates financing its recent purchase of GSX equipment with a mixture of cash and debt."

42.     Next, on February 3, 2014, the Board approved the commencement of the payment of an $0.08 per share quarterly cash dividend to shareholders, subject to capital availability and a determination that cash dividends continue to be in the best interest of the Company.  The Board set the first such quarterly dividend to be payable on February 24.  The declared amount represents an aggregate dividend of approximately $645,000 based on the number of issued and outstanding shares of Common Stock as of the declaration date, or approximately $2,580,000 on an annualized basis.

43.     Commenting on the 2014 fiscal second-quarter financial results, Defendant Jumper stated:

> While we are pleased with our return to profitability, the declaration of our second quarterly dividend payment and our ability to maintain our strong balance sheet, we are disappointed to have another short term utilization issue. We believe the issue will clear itself during the quarter. We continue to explore ways to right size our operation to fit current demand and project readiness timing while maintaining a high resolution product that continually meets client needs. Based on recent bid activity, we believe market conditions in the United States indicate signs of improvement for the second half of calendar 2014.

44.     In sum, Dawson is well positioned to generate significant earnings in the foreseeable future. Despite Dawson's bright financial prospects, the Board has now agreed to the merger with TGC which will dilute the share value of Dawson's current shareholders, provide no premium and subject Dawson shareholders to the downward pull on the deal value based on the plummeting share price of TGC and the Board's failure to require a collar.

**THE FLAWED PROCESS LEADING UP TO THE PROPOSED ACQUISITION**

45.     Significantly, Dawson and TGC have previously tried to consummate a strategic transaction. On March 20, 2011, they entered into a merger agreement whereby Dawson would issue shares of its common stock in exchange for outstanding shares of TGC. That deal, however, was subject to 2 provisions not present here. First, it required 80% approval of holders of TGC common stock and it contained a collar. At a special shareholder meeting held on October 27, 2011, TGC shareholders did not provide sufficient approval and the stock traded outside of the collar range.

46.     The Definitive Proxy claims that the parties had no "formal discussions" after October 27, 2011, and Defendant Jumper's idea on or about July 22, 2014, to reengage with TGC. The Definitive Proxy does not disclose, however, whether the parties maintained informal contact over the close to three-year period and the issues discussed.

47.     Significantly, while Dawson and TGC continued their relationship, the Dawson Board made no effort to conduct a market check or to engage any other possible bidders in the process.  Indeed, between July 28, 2014, and the entry into the deal on October 8, 2014, the Definitive Proxy states that no other potential bidders were even made aware of the possibility to engage in discussion with Dawson.  The Definitive Proxy, however, fails to disclose with requisite specificity, the reason for this decision to exclude other bidders.

48.     Moreover, as early as July 28, 2014, Dawson, through Defendant Jumper, and TGC, through its CEO, Wayne Whitener, apparently agreed that there should be no collar on stock prices.  No explanation has been provided for this crucial decision – one that is directly tied to the current loss of 30% of the implied value of the Proposed Transaction.

49.     On or about August 8, 2014, Dawson engaged Raymond James to provide initial analyses regarding the relative contributions of Dawson and TGC.  Raymond James had been the Company's banker for the failed 2011 deal with TGC.  Thereafter, on September 5, 2014, TGC formally retained Stephens.

50.     There was very little negotiation on the proposed share split between TGC and Dawson.  The initial grouping was 68%/32% in favor of Dawson and the eventual deal went off at 66%/34%.  There is no disclosure regarding efforts to move the percentage split one way or the other.

51.     On October 3, 2014, there was apparently discussion between Defendant Jumper and Raymond James regarding Jumper's desire to undertake the reverse stock split at a ratio that would provide sufficient cushion to protect the stock of the combined company from potentially trading below $10.00 per share.  There is no disclosure, however, regarding how this would be effectuated or the import of the $10.00 price point.

52.     On October 6, 2014, and October 7, 2014, Defendant Jumper and Mr. Whitener participated in certain phone calls regarding the reverse stock split.  Defendant Jumper reiterated his concerns regarding the trading price of the combined company if a 1-for-3 ratio was used but agreed to discuss with his advisors.  After additional discussions with Raymond James, he called Mr. Whitener to communicate that Dawson generally agreed to proceed with a 1-for-3 ratio for the reverse stock split, pending final incorporation of such ratio in the merger agreement and the approval from the Dawson board of the same.  The Definitive Proxy fails to disclose why Defendant Jumper changed his mind regarding his concerns with the ratio on the reverse stock split.

53.     On October 8, 2014, both the Dawson and TGC boards voted in favor of the Proposed Transaction.

**B.      The Proposed Transaction Undervalues Dawson Shares**

54.     On October 8, 2014, Dawson and  TGC issued a press release announcing the Proposed Transaction, which states in relevant part:

> MIDLAND, Texas, Oct. 9, 2014 /PRNewswire/ -- Dawson Geophysical Company (Dawson) (NASDAQ: DWSN) and TGC Industries, Inc. (TGC) (NASDAQ: TGE) today jointly announced a proposed strategic business combination.  Upon consummation of the transaction, current Dawson and TGC shareholders will own approximately 66% and 34% of the combined company, respectively. Closing of the transaction is anticipated during the first calendar quarter of 2015, subject to the approval by holders of 66.67% of the outstanding shares of both TGC and Dawson, as well as certain other closing conditions and regulatory approvals.
>
> The transaction is structured as a tax-free stock-for-stock transaction.  Dawson will merge with a TGC subsidiary and become a wholly-owned subsidiary of TGC.  TGC will change its name to Dawson Geophysical Company (hereinafter referred to as new Dawson).  The new Dawson shares will trade on NASDAQ under the symbol DWSN.
>
> Immediately prior to the transaction, TGC will implement a 1-for-3 reverse stock split.  The reverse stock split will provide for a sufficient number of TGC authorized shares to consummate the transaction and adjust the number of post-

transaction shares to facilitate trading within reasonable price ranges and volumes on NASDAQ.  After giving effect to the TGC reverse stock split, Dawson shareholders will receive 1.76 shares of TGC split-effected common stock for each share of Dawson common stock held at the effective time of the transaction, with cash to be paid in lieu of any fractional shares.  For example, at the effective time of the transaction, a TGC shareholder currently owning 100 shares of TGC common stock will own 33 shares of split-effected TGC common stock, while a Dawson shareholder currently owning 100 shares of Dawson common stock will receive 176 shares of TGC split-effected common stock.  As a result of the reverse stock split, TGC's currently outstanding shares will be reduced from approximately 22,001,125 million to 7,333,708 million shares and TGC will issue approximately 14,236,022 million TGC split-effected shares in exchange for approximately 8,065,233 shares held by Dawson shareholders.  Based on the above-noted exchange ratio and reverse stock split, at the effective time of the transaction, the implied valuation of the current Dawson shares should be three times the trading price of the TGC shares multiplied by 1.76.

Stephen Jumper, current Chairman, President and Chief Executive Officer of Dawson, will serve as Chairman, President and CEO of new Dawson. Wayne Whitener, current President, CEO and a Director of TGC, will serve as Vice Chairman of the Board and an officer of new Dawson. Ongoing operations will be conducted under the Dawson and Eagle Canada names.

In addition to Messrs. Jumper and Whitener, the Board of Directors of new Dawson will include four members of the current Dawson board - Craig Cooper, Gary Hoover, Ted North and Mark Vander Ploeg - and two members of the current TGC board – William Barrett and Dr. Allen McInnes.

The Dawson and TGC Boards of Directors have approved the transaction, and directors and certain officers representing approximately 28.89% of outstanding TGC shares and approximately 2.40% of outstanding Dawson shares have agreed to vote in favor of the transaction.  The Boards of Directors of both companies have recommended to their respective shareholders that they vote in favor of the transaction.

*Transaction Highlights:*

- *Expanded geographical presence and expertise to better serve client base*
- *Combined strong balance sheet will provide increased operational and financial flexibility*
- *Complementary equipment bases increase operational efficiencies and logistics*
- *Improved processes and increased efficiencies lead to lower cost structure and increased revenue*
- *Increased level of services and reduced outsourcing*
- *Increased channel count for improved efficiency, higher resolution imaging and to meet increased channel count requirements*

- *Expanded client base and order book will increase crew utilization rates*

Stephen Jumper, Chairman, President and Chief Executive Officer of Dawson, said, "This is an exciting time for our companies as we work together to combine our complementary resources and create a best-of-breed company. The combination of Dawson and TGC results in a stronger company that will better serve our valued clients, shareholders and employees. The demand on our technology has been to produce cost-effective, high-resolution images in a shorter cycle time. The combination of Dawson and TGC improves our ability to meet that demand with an expanded equipment base, logistics advantages, and improved services and expertise. Collectively, our resources are further positioned to increase utilization rates, reduce costs and provide multiple avenues of growth for the combined company."

Wayne Whitener, President and Chief Executive Officer of TGC, said, "We are extremely pleased to join forces with the Dawson Geophysical team. The combination of our shared technical, operational and international expertise provides opportunities to better serve our company's client base. I look forward to contributing to the success and growth of the combined organization."

Jumper concluded, "The combination of Dawson and TGC is well-positioned to respond to the needs of today's industry. We believe the benefits of this combination will extend to our valued clients, shareholders and employees for years to come. We encourage your support as we approach the shareholder vote and look forward to putting into action our more than 100 years of combined industry experience."

Raymond James & Associates, Inc. served as financial advisor to Dawson while Stephens Inc. served as financial advisor to TGC. Baker Botts L.L.P. served as legal counsel to Dawson while Haynes and Boone LLP served as legal counsel to TGC.

55.     The implied consideration to Dawson shareholders is insufficient, as it dilutes current Dawson holders interest in the Company, fails to account for the Company's future earning potential, provides no premium for the dilution and, in fact, and is structured such that Dawson shareholders are prejudiced by the current market position of TGC.

56.     Analyst expectations, book value and historical trading prices demonstrate the inadequacy of the Merger consideration.  In addition, the failure to negotiate a "collar" for the exchange ratio has created a situation where the Merger consideration is presently tanking based

on the poor performance of TGC stock.  Specifically, on the announcement of the proposed transaction, the implied consideration to Dawson shareholders was approximately $17.63 a share, based on the then current TGC share price of $3.34.  In effect, this amounted to a wash with the $17.57 share price for Dawson as of October 8, 2014.  However, because there is no collar on the exchange ratio, the current implied consideration to Dawson shareholders has dropped significantly since the announcement of the deal.  ***On December 30, 2014, the day prior to the filing of the Definitive Proxy, Dawson shareholders' stock was valued in the deal at only $11.45, a drop of over 35%.***

57.     Thus, while the implied consideration to Dawson shareholders dwindles, the fact remains that the Company's book value per share, per the Definitive Proxy, is approximately $25.00 a share.  Moreover, and related thereto, at least one Yahoo! Finance analyst has set a price target for Dawson Geophysical  shares as high as $30 per share.  Moreover, of the four analysts predicting the Company's stock performance, both the "Mean" and "Median" price targets, $21.25 and $21.50 per share respectively, are in excess of the implied Merger consideration.

58.     In sum, Dawson is poised to enjoy a lengthy period of significant growth, and the Proposed Transaction stands to prevent the Company's shareholders from attaining fair value for their shares.

## C.     The Windfall to the Individual Defendants

59.     The Proposed Transaction was also likely driven by the self-interest of certain Individual Defendants and the Company's officers.  As a result of the consummation of the Proposed Transaction, certain Dawson officers and directors will receive lucrative change in control payments not shared by other shareholders.

60.     Pursuant to the Definitive Proxy, the following table presents the compensation that may be paid or may become payable to Dawson's named executive officers upon consummation of the merger that is the subject of the advisory resolution proposal that Dawson shareholders are being asked to approve.

| | Cash ($)(1) | Equity ($) | Total ($) | |
|---|---|---|---|---|
| Stephen C. Jumper | — | 370,959(2) | — | 370,959 |
| C. Ray Tobias | — | 231,265(3) | — | 231,265 |
| James W. Thomas | — | 199,170(4) | — | 199,170 |
| Christina W. Hagan | — | 175,751(5) | — | 175,751 |
| K. S. Forsdick | — | 101,816(6) | — | 101,816 |

61.     In addition, immediately prior to the effective time of the merger, all unvested Dawson stock options, if any, outstanding at such time will vest and become exercisable.  The following table sets forth information concerning options relating to Dawson common stock held by Dawson's executive officers and directors as of December 29, 2014:

| Name | Number of Shares Underlying Unexercised Options | Exercise Price ($) |
|---|---|---|
| Stephen C. Jumper | 15,000 | 18.91 |
| C. Ray Tobias | 10,000 | 18.91 |
| Christina W. Hagan | 10,000 | 18.91 |
| James W. Thomas | 5,000 | 18.91 |
| K. S. Forsdick | 5,000 | 18.91 |

62.     Additionally, certain restricted stock and restricted stock unit awards will vest immediately prior to the effective time of the merger and the holders of such formerly restricted stock or restricted stock unit awards will have the right to participate in the merger as a holder of Dawson common stock.  The following table sets forth information concerning restricted stock and restricted stock units held by Dawson's executive officers and directors as of December 29, 2014:

| Name | Restricted Stock | Restricted Stock Units |
|---|---|---|
| Stephen C. Jumper | 15,000 | 21,246 |
| C. Ray Tobias | 10,000 | 10,863 |
| Christina W. Hagan | 7,500 | 8,622 |

| James W. Thomas | 9,000 | 7,932 |
| K. S. Forsdick | 5,000 | 2,586 |

63.     Defendant Jumper will also be eligible for over $370,000 in golden parachute payments if the deal is consummated.

64.     Finally, Defendant Jumper will become Chairman, President and Chief Executive Officer of TGC following the merger.  Moreover, the TGC board will include all current Dawson board members (Defendants Jumper, Cooper, Hoover, North, and Vander Ploeg) except for Defendant Thompson.

65.     The aforementioned lucrative payments cast further doubt that the process leading up to the announcement of the Proposed Transaction was fair to Dawson shareholders.

**D.     The Preclusive Deal Protection Devices**

66.     In addition to failing to engage in a fair and reasonable sales process, the Individual Defendants, likely driven by their own personal interests, agreed to certain deal protection devices that operate conjunctively to deter other suitors from submitting a superior offer for the Company.

67.     First, the Merger Agreement provides for an onerous no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to comply with their fiduciary duties to obtain the best price possible under the circumstances. Specifically, Section 7.3 of the Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) solicit, initiate, approve, endorse, recommend or encourage, or take any other action designed to, or which would reasonably be expected to, facilitate, any inquiry or the making or announcement of any proposal or offer that constitutes, or that would reasonably be expected to lead to, an Acquisition Proposal in respect of such No-Shop Party,

(ii) engage, continue or otherwise participate in any discussions or negotiations regarding, or furnish (or cause to be furnished) non-public information relating to such No-Shop Party or any of its Subsidiaries or afford access to properties, books or records of the No-Shop Party or any of its Subsidiaries to any Person in connection with or in furtherance of any Acquisition Proposal,

(iii) approve or recommend, or propose to approve or recommend, or consummate, execute or enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement, exchange agreement, option agreement, joint venture agreement, partnership agreement or other agreement, constituting or related to, or that is intended to or would reasonably be expected to lead to an Acquisition Proposal (other than confidentiality agreements contemplated by this Section 7.3), or

(iv) propose publicly or agree to do any of the foregoing.

68.     Furthermore, Section 7.3 of the Merger Agreement grants TGC matching rights, which provides TGC with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which TGC can use to prepare a matching bid; and (ii) three business days to negotiate with Dawson, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

69.     The non-solicitation and matching rights provisions unfairly deter superior bidders from making a fair offer for the Company, as many will be hesitant to expend the time, cost, and effort of making a superior proposal while knowing that TGC can easily foreclose a competing bid.  As a result, these provisions unreasonably favor TGC, to the detriment of Dawson public shareholders.

70.     Lastly, Section 9.5 of the Merger Agreement provides that Dawson must pay TGC a termination fee of $2 million (and up to $1.5 million in expense reimbursement) if the deal is terminated under certain circumstances.  While the Company claims in the Definitive Proxy that the $2 million termination fee is "set at a level that created a low barrier of entry for other potential acquirers," the fact is that such a claim is impossible to support in light of the precipitous 30%+ plunge of TGC's share price since the announcement of the deal.  Thus, the

termination fee represents an amount that will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to Dawson's shareholders.

71.     These termination fee provisions further deter other suitors from making a superior proposal for the Company, as they will have to pay a naked premium for the right to provide Dawson shareholders with a better offer.

72.     Ultimately, these deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

**E.**     **The Incomplete and Materially Misleading Definitive Proxy**

73.     On November 6, 2014, TGC filed the S-4 with the SEC in connection with the Proposed Transaction and on December 31, 2014, the Definitive Proxy.  The Definitive Proxy fails to provide the Company's shareholders with material information concerning both the process leading up to the consummation of the Merger Agreement and the financial analyses performed by Dawson's financial advisor, Raymond James, and TGC's advisor, Stephens, performed in support of their respective fairness opinions.  As a result of the incomplete and misleading Definitive Proxy, Dawson's shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**I.**     **Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

74.     Specifically, the Definitive Proxy fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the Definitive Proxy fails to disclose the following information:

a.      The efforts made by Dawson to identify "a potential candidate that presented an attractive acquisition target or combination partner.

b.      The exchange ratio and implied premium (if any) for the 2011 deal that fell through between Dawson and TGC.

c.      The reason that the parties believed that the "most desirable structure" for a possible deal between Dawson and TGC would not include a collar on the price of Dawson or TGC stock for the present proposed transaction.

d.      The reason(s) that Stephen Jumper believed it was a good idea to re-visit a deal with TGC in the July 2014 time frame.

e.      The "enumerated" reasons set forth by Mr. Jumper and Mr. Whitener on September 3, 2014, why a business combination "would yield favorable results for both companies and their shareholders."

f.      The reason(s) Raymond James and Stephens failed to conduct a discounted cash flow analysis.

g.      Whether TGC was permitted to have a bring-down fairness opinion and the reason(s) why TGC wanted the ability to procure same.

h.      The operational and financial benefits discussed by Stephens with TGC Board on September 26, 2014.

i.      Why Mr. Jumper believed that undertaking the reverse stock split at a particular ratio would "provide sufficient cushion to protect the stock of the combined company from potentially trading below $10.00 a share.

j. The efforts made by the TGC Board's position to determine as of October 7, 2014, that it was not aware of other strategic alternatives currently available to TGC reasonably expected to be more attractive that the deal with Dawson.

k. How the TGC Board intended to structure the deal with Dawson in a way to "create low barriers of entry in case a third party acquirer emerged."

l. Why, in light of the fact that no market check was conducted, did TGC agree to a "no shop."

m. The changes made by Stephens to its updated fairness opinion delivered to the TGC Board on October 8, 2014.

n. The basis for the amendment of the Dawson shareholder rights plan but only related to the specific deal contemplated with TGC.

## II. Materially Incomplete and Misleading Disclosures Concerning Raymond James' Financial Analyses

75. While the Definitive Proxy discloses certain information regarding the financial analyses Raymond James performed to support its Fairness Opinion, the information is incomplete and misleading because it fails to provide, amongst other things, the following:

With respect to the *Selected Public Companies Analysis*, the Definitive Proxy fails to disclose:

a. The metrics for each of the five companies used in the analysis, as opposed to the minimum, median, mean and maximum metrics and the metrics for each of the five companies used in the remainder of the analysis, as opposed to only the minimum and maximum metrics (*see* Definitive Proxy at 109-110);

b. Did Raymond James perform any type of benchmarking analyses for Dawson in relation to the selected public companies?

76.     While the Definitive Proxy discloses certain information regarding the financial analyses Stephens performed to support its Fairness Opinion, the information is incomplete and misleading because it fails to provide, amongst other things, the following:

With respect to Stephens' *Selected Public Companies Analysis*, the Definitive Proxy fails to disclose:

a.     The metrics for each of the five companies used in the analysis for EV/Rev and EV/EBITDA. as opposed to the minimum, median, mean and maximum metrics (*see* Definitive Proxy at 114-115);

b.     Did Raymond James perform any type of benchmarking analyses for Dawson in relation to the selected public companies?

*Selected Transactions Analysis*

a.     The LTM EBITDA multiples of each of the selected precedent transactions analyzed by Stephens:

b.     Did Stephens perform any type of benchmarking analyses for TGC in relation to the precedent transaction companies?

*Premiums Paid Analysis*

a.     The actual premiums paid in the 11 public merger and acquisition transactions in the oilfield services sector.

b.     The basis for Stephens' professional judgment that the premium range should be 0% - 30% when the analysis established that the more similar deals (stock consideration) indicate a Mean between 44.9%-51.9% and a Median between 37.3%-49% and a minimum premium of 17.1%.

77.     Additionally, the Definitive Proxy also fails to provide material, necessary information regarding the projected financial performance of both Dawson and TGC.  While this information is material in all transactions, it is particularly relevant here given the structure of the transaction.   As such, the Definitive Proxy further fails to provide adequate information to evaluate the deal as follows:

a.     Dawson's Unaudited Prospective Financial projections relied upon by Raymond James and TGC for purposes of their analyses, for all relevant time periods, including:

    i.     R&D
    ii.     G&A
    iii.     Sales and marketing
    iv.     EBIT (or D&A)
    v.     Taxes (or tax rate)
    vi.     Changes in net working capital
    vii.     Stock-based compensation expense
    viii.     Unlevered free cash flow
    ix.     Synergies

b.     TGC's Unaudited Prospective Financial projections relied upon by Raymond James and TGC for purposes of their analyses, for all relevant time periods, including:

    i.     R&D
    ii.     G&A
    iii.     Sales and marketing
    iv.     EBIT (or D&A)
    v.     Taxes (or tax rate)
    vi.     Changes in net working capital
    vii.     Stock-based compensation expense
    viii.     Unlevered free cash flow
    ix.     Synergies

78.     The Definitive Proxy also fails to disclose the following miscellaneous material information:

      a.     The amount or portion of Stephens' $1 million fee that was payable upon delivery of its opinion and the amount or portion of Stephens' fee that is payable upon consummation of the Merger (*see* Definitive Proxy at 121).

79.     In sum, the Individual Defendants have breached their fiduciary duties owed to Dawson shareholders.  The Board failed to obtain reasonable consideration for Dawson shareholders, agreed to onerous deal protection devices that may prevent the emergence of a superior offer, failed to provide the Company's shareholders with material information concerning the Proposed Transaction that is necessary for shareholders to cast an informed vote on the Merger, and likely put their own personal interests ahead of those of Dawson shareholders while negotiating the terms of the Proposed Transaction.

80.     As a result of the aforementioned breaches of fiduciary duty, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against the Individual Defendants
for Breach of Fiduciary Duties**

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

82.     The Individual Defendants have violated fiduciary duties of care, loyalty, good faith, and candor owed to Dawson shareholders.

83.     By the acts, transactions, and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Dawson.

84.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, independence, and candor owed to Dawson shareholders because, among other reasons, they failed to take reasonable steps to obtain and/or ensure that Dawson shareholders receive adequate consideration for their shares, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for the Company, and caused a materially incomplete and misleading Definitive Proxy concerning the Proposed Transaction to be filed with the SEC.

85.     By reason of the foregoing acts, practices, and courses of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

86.     As a result of the actions of Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Dawson assets and businesses, have been and will be prevented from obtaining a fair price for their Dawson common shares, and will not be able to cast an informed vote the Proposed Transaction.

87.     Unless the Court enjoins Defendants, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

88.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class Against Dawson, TGC, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty**

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

90.     Dawson, TGC, and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Dawson's shareholders, and have participated in such breaches of fiduciary duties.

91.     Dawson, TGC, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Dawson, TGC, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

## COUNT III

**On Behalf of Plaintiff and the Class for Violations of Sections 14(a) and of the Exchange Act Against the Company and the Individual Defendants**

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

93.     Defendants have issued the Definitive Proxy with the intention of soliciting shareholder support for the Proposed Transaction.

94.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

95.     Specifically, the Definitive Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth *supra*.  Moreover, in the exercise of reasonable care, Defendants should have known that the Definitive Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

96.     The misrepresentations and omissions in the Definitive Proxy are material to Plaintiff and the Class, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## COUNT IV

**On Behalf of Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Dawson within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Dawson, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Definitive Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff and the Class contend are false or materially incomplete and therefore misleading.

99.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Definitive Proxy and other statements alleged by Plaintiff and the Class to be

misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Definitive Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

101.   In addition, as the Definitive Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The Definitive Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

102.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

103.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

104.   Plaintiff has no adequate remedy at law.

## COUNT V

**Derivative Claim for Breach of Fiduciary Duty Against the Individual Defendants**

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

106.    The Individual Defendants, knowingly, recklessly, and/or in bad faith breached their fiduciary duties owed to Plaintiff and the Class in connection with the Proposed Transaction, including but not limited to, their fiduciary duties to maximize shareholder value and to disclose all information necessary for Dawson shareholders to make a fully informed decision concerning whether or not to vote for or against the Proposed Transaction.   The Individual Defendants have acted to put their personal interests and the interests of TGC ahead of the interests of Dawson.

107.    The Individual Defendants have violated their fiduciary duties by agreeing to the Proposed Transaction without regard to the fairness of the Proposed Transaction to Dawson.  By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, usurped Dawson's assets for themselves, as demonstrated by the allegations above.  The Individual Defendants knowingly, recklessly, and/or in bad faith breached their fiduciary duties to maximize shareholder value and disclose all information necessary for Dawson shareholders to make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

108.    As a direct and proximate result of the Individual Defendants' conduct, Dawson will suffer irreparable harm if the Proposed Transaction proceeds.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally, as follows:

A.       Declaring this action is properly maintainable as both a derivative action and  a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.       Declaring that any derivative claims for relief raised herein, and Plaintiff's standing to prosecute such claims, will survive the completion of the Proposed Transaction;

C.       Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for the Company's shareholders and discloses all material information regarding the Proposed Transaction;

D.       Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.       Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

F.       Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance for attorneys' and expert fees and expenses; and

G.       Granting Plaintiff and other members of the Class such further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  January 7, 2015.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____

Thomas E. Bilek
Texas Bar 02313525
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Attorneys for Plaintiff*

**OF COUNSEL:**

Evan J. Smith
Marc L. Ackerman
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA  19004
610-667-6200
610-667-9029 (fax)